JOHN D. UPHAM and ESTATE OF MARION B. UPHAM, DECEASED, JOHN D. UPHAM, Personal Representative, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Upham v. Commissioner
Docket No. 23053-85.
United States Tax Court
T.C. Memo 1989-253; 1989 Tax Ct. Memo LEXIS 253; 57 T.C.M. (CCH) 508; T.C.M. (RIA) 89253; May 24, 1989. Jerome R. Rosenberg and Robert A. Sternbach, for the petitioners. Carolyn S. Rose and Craig Connell, for the respondent. JACOBS
MEMORANDUM FINDINGS OF FACT AND OPINION JACOBS, Judge: Respondent determined a deficiency in petitioners' 1981 Federal income taxes in the amount of $ 2,776. At trial, respondent moved that the Court determine that *256 the entire 1981 deficiency was attributable to a tax motivated transaction under section 6621(c) of the Internal Revenue Code of 1986. [1] The deficiency arises as a result of the disallowance of petitioner John D. Upham's distributive share of a loss reported by Prince Associates (the Partnership), a limited partnership organized to purchase and exploit a feature-length motion picture entitled "Prince of the City" (the film). The issues for decision are: (1) whether petitioner John D. Upham, as a limited partner of the Partnership, is entitled to the claimed loss and a tentative investment tax credit, and if so, in what amounts; (2) whether petitioners are liable for additional interest under section 6621(c). FINDINGS OF FACT Preliminary Matters
This is the lead case concerning the validity of losses and investment tax credit claimed by the partners of the Partnership. Some of the facts have been stipulated *257 and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. John D. Upham (John) and Marion B. Upham (Marion), husband and wife, timely filed a joint Federal income tax return for 1981. Marion died prior to the filing of the petition herein; John is the Personal Representative of Marion's estate. John, a patent attorney, individually acquired an interest in the Partnership. The Partnership reported a loss for 1981 in the amount of $ 5,860,810, of which John claimed $ 76,530 as his distributive share. Attached to petitioners' 1981 tax return was Form 3468 (Computation of Investment Credit) which showed a $ 6,603 tentative investment tax credit available with respect to John's interest (as a limited partner of the Partnership) in the film. Petitioners were unable to utilize such credit in 1981 because they reported no tax due to the fact they reported a negative amount as their 1981 taxable income. Hereinafter John will be referred to as petitioner. Petitioner resided in St. Louis, Missouri, at the time the petition herein was filed. The Limited Partnership
The Partnership was organized as a limited partnership *258 under the laws of the State of New York on March 23, 1981; Daniel Glass (Glass) and Frank Menke (Menke) were its general partners. Pursuant to a Private Offering Memorandum dated May 27, 1981, the Partnership offered for sale twenty five limited partnership units. Petitioner purchased one-third of one unit on August 14, 1981. He contributed cash in the amount of $ 20,333 and executed two promissory notes. One note, payable on January 10, 1982, was in the amount of $ 20,000; the other, payable on January 10, 1983, was in the amount of $ 18,333. Each note was secured by an irrevocable letter of credit. In addition to his capital contribution, petitioner executed a Recourse Purchase Note Assumption Agreement (Assumption Agreement). Under the Assumption Agreement, petitioner assumed the primary obligation to pay his pro rata share (i.e., $ 78,726.67) of the principal amount of the Partnership's $ 6,025,000 purportedly recourse promissory note payable to Orion Pictures Company (Orion). General Partners
As general partners of the Partnership, Glass and Menke negotiated with Orion for the acquisition of the film. Daniel Glass, a practicing attorney, has had significant *259 experience in the motion picture industry. [2] In the five years preceding the film transaction involved herein, Glass was a general partner or organizer of various partnerships which financed the production or purchase of at least 15 motion pictures. Frank Menke, an investment advisor, had acted as general partner of a partnership which furnished advertising services for another film entitled "Excalibur." The Film
The film was produced by LAH Film Corporation for Orion. It is based upon actual events and involves police and judicial corruption and the narcotics traffic in New York City. The focus of the film is principally on the disclosures made by a member of the undercover narcotics squad and the psychological and emotional pressures he endured, as an informant, as he is forced to reveal more and more of the corrupt activities of his partners *260 and close personal friends on the squad whom he originally vowed to protect. It was shot betwen March and June, 1980, entirely on location; it was directed by Sidney Lumet and starred Treat Williams and Jerry Orbach. The screenplay was written by Jay Presson Allan. The film went into nationwide release on August 19, 1981, at over 1,000 theatres. Purchase Agreement
After viewing a private screening of the film, Glass became interested in acquiring it. On May 29, 1981, the Partnership entered into an agreement (Purchase Agreement) with Orion to acquire the film for $ 11,875,000, which amount was warranted to be the cost to produce the film exclusive of studio overhead charges and production financing. The purchase price was payable as follows: (1) $ 100,000 cash at closing (August 19, 1981); (2) $ 1,400,000 cash on February 1, 1982; [3] (3) delivery of a promissory note in the amount of $ 6,025,000 with interest at 9 percent per annum, due January 10, 1990, purportedly recourse as to repayment of principal and nonrecourse as to repayment of interest (Recourse Note); and (4) delivery of a nonrecourse promissory note in the amount of $ 4,350,000 with interest at 9 percent *261 per annum, due January 10, 1990 (Nonrecourse Note). No payment of either principal or interest was due on either the Recourse Note or Nonrecourse Note until January 10, 1990. Under the Purchase Agreement, Orion sold all of its right, title and interest in and to the film, subject to the rights of certain persons to deferments and contingent payments out of the flim's gross receipts, excepting the following rights: (a) Any of the literary, dramatic and/or musical material contained in the Picture or upon which the Picture is based and the copyrights thereto and any renewals and extensions thereof (all said literary, dramatic and/or musical material being hereinafter collectively called the "Property"), except to the extent necessary to allow [the Partnership] to distribute the Picture throughout the universe; (b) Any television series rights, so-called television "special" rights, remake or sequel rights, or any other ancillary rights and/or allied rights (including, without limitation, theatrical stage rights) but specifically excluding the benefits of any merchandising and commercial tie-in *262 rights, and music publishing and sound track album rights, which are included in the grant hereunder; (c) The right to enter into agreements with respect to the Property. (d) Any option rights with respect to the services of any person rendering services in or with respect to the production of the Picture. The rights acquired by the Partnership included: The negative and positive prints, soundtrack and all other pre-print physical material pertaining to the film, the copyright and the right to secure copyright and extensions and renewals thereof, all of [Orion's] rights in the literary, dramatic and musical material used therein as may be necessary to permit the exploitation of the film in all media, [Orion's] sole, exclusive and irrevocable right, license and privilege, under copyright and otherwise, to rent, lease, license, exhibit, distribute, reissue and otherwise to deal in and with respect to the film and any part thereof, prints thereof and trailers thereof and to sublease or license others so to do throughout the universe in any and all languages, and including, but not limited to, cut-in, superimposed, dubbed and synchronized versions, all of [Orion's] so-called *263 "theatrical" rights, "nontheatrical" rights, and "television" rights in the Picture; * * *. Distribution Agreement
Concurrently with its purchase of the film from Orion, the Partnership entered into a distribution agreement (Distribution Agreement) with Orion pursuant to which Orion had the exclusive rights to distribute and exploit the film throughout the world in all media for an initial period of 12 years with an option for an additional 12 years and thereafter an option to extend the distribution grant in perpetuity. Prior thereto, on March 1, 1978, Orion had granted a license to Warner Bros. Inc. to distribute all motion pictures produced, financed or otherwise acquired by Orion. Thus, actual distribution of the film was through Warner Bros. Inc. (Warner Bros.) Pursuant to the Distribution Agreement, Orion had the right to edit the film, change the film titles, make foreign language versions of the film, exhibit the film at film festivals, and display its logo in the film credits and in connection with advertising the film. The Distribution Agreement provided that although Orion would consult with the Partnership with respect to advertising and promoting the *264 film and its release pattern, Orion's decisions would be final and binding. Thus, Orion had, in effect, absolute control over the exploitation of the film, and in fact, the film was promoted as "an Orion Pictures Release Through Warner Bros., a Warner Communications Company." The Distribution Agreement provided for an allocation of gross receipts, i.e., the aggregate amount received by the distributor from all sources including domestic and foreign theatrical distribution, home video sales and rental, cable TV rentals and commercial TV rentals. The allocation of gross receipts between Orion and the Partnership was based on complex computations. Cutting through the complexities, the Partnership was entitled to receive: (a) 3.5% of the first $ 15 million in gross receipts, plus (b) 7.5% of gross receipts in excess of $ 15 million until breakeven is reached, plus (c) 8.2% of gross receipts in excess of breakeven. Orion was entitled to receive the remainder. The Distribution Agreement obligated the Partnership to spend $ 4,000,000 to advertise the film. In addition to the $ 4,000,000 to be spent by the Partnership, Orion agreed to spend an additional $ 7,875,000 to advertise *265 the film. In the event Orion failed to spend $ 7,875,000 by December 31, 1982, then Orion was obligated to pay the Partnership on January 10, 1990, as an additional license fee, a sum equal to the difference between $ 7,875,000 and the amount it actually expended (Additional License Fee). Expenses paid for advertising the film through December 31, 1981 totaled $ 3,391,521. An additional $ 650,206 was spent in 1982. Thus, the expenses paid to advertise the film through December 31, 1982 totaled $ 4,041,727, with Orion actually spending $ 41,727 of this amount. The Distribution Agreement further provided that the Partnership was entitled to receive from Orion, by January 10, 1990, to the extent of and to be applied against the balances due on the Recourse and Nonrecourse Notes, an amount equal to 100 percent of the film's gross receipts derived prior to December 31, 1982, plus reduced multiples (ranging from 5.5 to .7) of gross receipts derived between 1982 and 1989. As a result of this provision (the multiplier clause), if the gross receipts of the film generated over an 8 year period totaled approximately $ 1,500,000; the Partnership's obligation to Orion under the Recourse *266 Note (and petitioner's and the other partners' obligations under the Assumption Agreement) would be satisfied. As of December 31, 1981, the film's gross receipts totaled $ 3,315,285. Miscellaneous Agreements
On July 31, 1981, the Partnership borrowed $ 2,350,000 from Chemical Bank (Marketing Loan) and executed a nonrecourse promissory note for such amount payable on January 10, 1984 (Marketing Loan Note). The proceeds of the Marketing Loan, together with $ 1,650,000 from capital contributions to the Partnership, were used to meet the Partnership's $ 4,000,000 advertising obligation under the Distribution Agreement. Pursuant to an Assignment Agreement dated as of July 31, 1981 (Assignment Agreement), the Partnership assigned its right to the first $ 2,350,000 of gross receipts as security for the Marketing Loan. Under the Assignment Agreement, Orion agreed to make payment of the foregoing amount directly to Chemical Bank on January 10, 1984, to the extent then earned. Orion further agreed to make the interest payments on the Marketing Loan. By letter dated July 31, 1981, Warner Brothers guaranteed the foregoing obligations of Orion. Under the Distribution Agreement, *267 the Partnership's obligation to pay interest with respect to the Marketing Loan Note was satisfied out of the gross receipts to which it was entitled. If such receipts were less than the amount of interest due on the Marketing Loan Note, then Orion agreed to advance the difference as a non-interest bearing nonrecourse loan to the Partnership with the right to recoup any payment from future receipts otherwise due the Partnership. In addition to the Marketing Loan, Chemical Bank agreed to loan the Partnership up to $ 2,472,500. On July 31, 1981, the Partnership borrowed $ 1,642,116 (of the available $ 2,472,500) and executed a promissory note for such amount payable in two installments, January 10, 1982 and January 10, 1983 (Additional Financing Loan). Petitioner executed an Additional Financing Loan Assumption Agreement pursuant to which he assumed an obligation to repay a percentage of the Additional Financing Loan equal to his share in the Partnership. Results
The parties seemingly agree, and the Partnership's private offering memorandum so stated, the film would have to generate gross receipts of $ 45,000,000 in order for the limited partners in the Partnership to *268 fully recoup their investment. The private offering memorandum informed the investors that only a small percentage of films achieved gross receipts of $ 45,000,000. The film was not a financial success; gross receipts as of December 31, 1985 totaled $ 11,880,063. Subsequent to the film's release in August, 1981, the general partners became displeased with the advertising and distribution efforts being made by Orion. The general partners consulted with the law firm of Hess, Segall, Guterman, Pelz and Steiner to review the feasibility of instituting litigation against Orion and Warner Bros. The general partners decided against commencing a lawsuit after their attorneys advised that the probability of success did not warrant the costs of prosecuting the lawsuit. The Partnership did not earn any income in 1981. During the period 1981 through 1985, the Partnership reported losses as follows: Year
Loss
1981
$ 5,860,810
1982
2,696,483
1983
2,487,062
1984
175,567
1985
2,586,137
On its 1981 partnership tax return, the Partnership deducted the following: Deductions
Amount
Interest
$    16,092
ACRS deductions
1,789,500
Amortization
35,119
Advertising
4,000,000
Tax Advice
20,000
Miscellaneous
99
Total Deductions
$ 5,860,810
*269 The Partnership depreciated the film under the Accelerated Cost Recovery System (ACRS) and treated the film as 5 year recovery property with a depreciable basis of $ 11,930,000. The Partnership claimed a qualified investment of $ 5,053,333 for investment tax credit purposes. It also deducted a $ 20,000 legal fee paid to the law firm of Arnold & Porter for a tax opinion which was contained in the Private Offering Memorandum. OPINION Respondent's initial argument is that the Partnership did not acquire an ownership interest in the film as the transaction was in fact devoid of economic substance. Respondent alternatively asserts that the Partnership, at most, acquired a speculative future profits interest in the film. Petitioner, on the other hand, contends that the substance of the transaction comports with its form, and the Partnership did in fact acquire the film from Orion. Whether the Partnership became the owner of the film for tax purposes as a result of the transactions with Orion is a question of fact to be determined by reference to the written agreements and the attendant *270 facts and circumstances. Durkin v. Commissioner,87 T.C. 1329 (1986); Tolwinsky v. Commissioner,86 T.C. 1009, 1041 (1986); Law v. Commissioner,86 T.C. 1065, 1095 (1986); Grodt & McKay Realty, Inc. v. Commissioner,77 T.C. 1221, 1237 (1981); Miller v. Commissioner,68 T.C. 767, 776 (1977). The term "sale" is given its ordinary meaning for Federal income tax purposes and is generally defined as a transfer of property for money or a promise to pay money. Commissioner v. Brown,380 U.S. 563 (1965). The transfer of formal legal title to shift the incidence of taxation attributable to ownership of the property where the transferor continues to retain significant control over the property transferred is disregarded for tax purposes. Tolwinsky v. Commisioner,86 T.C. at 1041; Law v. Commissioner,86 T.C. at 1094. See also Helvering v. Clifford,309 U.S. 331 (1940); Helvering v. F. & R. Lazarus Co.,308 U.S. 252 (1939); *271 Hilton v. Commissioner,74 T.C. 305 (1980), affd. 671 F.2d 316 (9th Cir. 1982); Miller v. Commissioner, supra."Taxation is not so much concerned with the refinements of title as it is with the actual command over the property taxed - the actual benefit for which the tax is paid." Corliss v. Bowers,281 U.S. 376, 378 (1930). The entitlement to deduct depreciation is not predicated on the mere holding of legal title but rather upon capital investment. Gladding Dry Goods v. Commissioner,2 B.T.A. 336 (1925). The transfer of title to a motion picture is accomplished through the transfer of both the negative and the copyright. Ownership of a motion picture negative is distinct from ownership of the copyright thereto (17 U.S.C. section 27 (1976); 17 U.S.C. section 202 (1982) (effective Jan. 1, 1978); Michael Todd Co. v. Los Angeles County,57 Cal. 2d 684, 371 P.2d 340, 21 Cal. Rptr. 604 (1962), and cases cited therein), and ownership of the film *272 negative without possession of at least certain of the rights encompassed by the copyright is commercially valueless. See Misbourne Pictures Ltd. v. Johnson,189 F.2d 774, 776 (2d Cir. 1951). Copyrights are monopolies; "they entitle the owner to prohibit various kinds of reproduction, and to relieve individuals of these prohibitions by licenses." Goldsmith v. Commissioner,143 F.2d 466, 467 (2d Cir. 1944); (L. Hand, J. concurring), affg. on other grounds 1 T.C. 711 (1943). With respect to a motion picture, the exclusive rights that comprise the so-called "bundle of rights" (that is, a copyright) are the rights to produce copies of the motion picture, prepare derivative works based upon the motion picture, distribute copies of the motion picture to the public by sale or rental, exhibit the motion picture to the public, and display still photographs taken from the motion picture to the public. 17 U.S.C. section 1 (1976); *273 17 U.S.C. section 106 (1982) (effective Jan. 1, 1978). Such rights may be subdivided indefinitely and may be owned and enforced separately. 17 U.S.C. section 201(d) (1982) (effective Jan 1. 1978). The sale of a motion picture for Federal tax purposes occurs when there is a transfer of all substantial rights of value in the motion picture copyright. No sale occurs if the transferor retains proprietary rights in the motion picture. Durkin v. Commissioner, supra;Tolwinsky v. Commissioner,86 T.C. at 1042- 1043. See Carnegie Productions v. Commissioner,59 T.C. 642, 653 (1973); Cory v. Commisioner,23 T.C. 775 (1955), affd. 230 F.2d 941 (2d Cir. 1956). The consideration, for tax purposes, as to whether the benefits and burdens of ownership have been transferred is essentially a factual determination which is to be ascertained from the intention of the parties as evidenced by the written agreements read in light of the attendant facts and circumstances. Leahy v. Commissioner,87 T.C. 56, 66 (1986); *274 Grodt & McKay Realty, Inc. v. Commissioner, supra.
The pertinent factors for consideration, as outlined in Houchins v. Commissioner,79 T.C. 570, 591 (1982), are: (1) whether legal title passes; (2) the manner in which the parties treat the transaction; (3) whether the purchaser acquired any equity in the property; (4) whether the purchaser has any control over the property and, if so, the extent of such control; (5) whether the purchaser bears the risk of loss or damage to the property; and (6) whether the purchaser will receive any benefit from the operation or disposition of the property. See Grodt & McKay Realty, Inc. v. Commissioner, supra at 1237-1238. * * * [Fn ref. omitted.] Respondent asserts that petitioner, in his capacity as a limited partner of the Partnership, did not purchase an ownership interest in the film as the transfer of legal title, though in the form of a sale, was devoid of all commercial, legal and economic reality. We agree in part. In our opinion, petitioner did not acquire an ownership interest in the film; however, we believe the transaction between the Partnership and Orion was not devoid *275 of commercial, legal and economic significance. We are satisfied that the negotiations by the Partnership's general partners on behalf of the Partnership were arm's-length dealings. Furthermore, we are satisfied that the amount paid for the film ($ 11,875,000) aproximated its value at the date of transfer. Compare Helba v. Commissioner,87 T.C. 983 (1986); Falsetti v. Commissioner,85 T.C. 332 (1985). In our opinion, the Partnership had an opportunity to realize an economic gain which we believe is indicative of the Partnership's having a true financial interest in the exploitation of the film. Hence, we believe the Partnership acquired a speculative and limited future profits interest in Orion's exploitation of the film, as opposed to an ownership interest in the film. The record clearly reveals that any rights which Orion may have conveyed to the Partnership either were granted back to Orion by virtue of the Distribution Agreement or were of no apparent commercial value. The Partnership transferred to Orion all the basic rights associated with a copyright retaining a mere "bare" copyright. The integrated transfers between the Partnership *276 and Orion resulted in Orion's having the rights to make copies of the film, to exhibit the film, and to otherwise exploit any dramatic material or literary material upon which the film was based. In fact, the film was promoted as "an Orion Pictures Release." Orion held rights to theatrical exploitation, pay television, video cassettes, and commercial television throughout the world. Such enumerated rights combined with the sequel rights retained by Orion provided Orion with the entire bundle of rights that is a copyright. Durkin v. Commissioner, supra;Tolwinsky v. Commissioner, supra.
We have no doubt but that Orion, rather than the Partnership, would be the primary beneficiary of the film's financial success. The terms of the Distribution Agreement, though convoluted and complex, clearly indicate this to be the case. We conclude, therefore, that the Partnership merely acquired an intangible contract right to participate in the profits from the exploitation of the film. [4]
*277 Because Orion was the actual owner of the film, the Partnership is not entitled to claim depreciation or cost recovery deductions with respect to the film. The Partnership is, however, entitled to depreciate its intangible contract right to participate in the gross receipts generated from Orion's distribution efforts. Durkin v. Commissioner, supra;Tolwinsky v. Commissioner,86 T.C. at 1052, 1053. We next must decide whether the Partnership can include the Recourse Note and Nonrecourse Note in its depreciable basis in the intangible contract right. In our opinion, neither of these notes represent genuine indebtedness and thus cannot be included in basis. With respect to the inclusion of the Nonrecourse Note in depreciable basis, the obligation of the Partnership was payable solely from the Partnership's allocated share of the film's gross receipts. While the use of a nonrecourse note in a sale/leaseback context does not necessarily deprive the debt of its character as genuine indebtedness, such transactions are subject to special scrutiny due to the obvious *278 opportunities for "trifling with reality." Elliott v. Commissioner,84 T.C. 227, 244 (1985), affd. without published opinion 782 F.2d 1027 (3d Cir. 1986). Here, we have determined that the Partnership had only a limited income interest in the gross receipts of the film. In our opinion, the Nonrecourse Note and the provisions for retiring it were mere paper transactions lacking economic substance, Tolwinsky v. Commissioner, supra;Law v. Commissioner, supra, and served no "purpose, substance or utility apart from the anticipated tax consequences." Goldstein v. Commissioner,364 F.2d 734, 740 (2d Cir. 1966), affg. 44 T.C. 284 (1965). With respect to the inclusion of the Recourse Note in depreciable basis, petitioner executed an Assumption Agreement pursuant to which he purportedly became personally obligated to pay off his pro rata share of the Recourse Note. Respondent asserts that the Assumption Agreement is without economic substance because at the time it was executed petitioner and the other limited partners did not expect Orion to enforce it, and that therefore, they would not *279 be called upon to pay off their pro rata shares of the Recourse Note. We agree. As a result of the multiplier clause, the $ 6,025,000 obligation purportedly owed by the Partnership to Orion under the Recourse Note effectively would be satisfied if the film produced gross receipts of $ 1,500,000. In our opinion, it was unrealistic to believe that the film would not produce gross receipts of $ 1,500,000 over an 8 year period. Our belief is based on the fact that the film: (1) was a major feature-length motion picture that cost $ 11,875,000 to produce, (2) had an initial advertising budget of over $ 4,000,000 (and an eventual advertising budget of $ 11,875,000), and (3) went into nationwide release at over 1,000 theaters. In fact, petitioner's own expert projected that the film would produce gross receipts of $ 45,000,000. Petitioner failed to provide any plausible business reason to justify the multiplier clause. [5] The apparent inference to be drawn from the multiplier clause is to exculpate the limited partners of the Partnership from any real monetary exposure under the Recourse Note. *280 In addition, the Distribution Agreement required Orion to pay the Partnership, on January 10, 1990, an amount equal to the difference between $ 7,875,000 and the actual advertising expenses incurred by it prior to December 31, 1982. We believe it unlikely that if the film did not generate gross receipts of at least $ 1,500,000 by December 31, 1982, Orion would spend $ 7,875,000 to advertise the film; and if Orion did not spend such an amount (which in fact it did not), then it (Orion) had to pay the Partnership the Additional License Fee which would be applied to offset the Partnership's obligation to Orion under the Recourse Note. Accordingly, we find that the Recourse Note was not genuine. And as an aside, the fact that the fair market value of the film approximated the purchase price for the film ($ 11,875,000) is not determinative as to whether the Recourse Note was genuine because we have concluded that the Partnership did not purchase the film for Federal tax purposes. Law v. Commissioner,86 T.C. at 1100. Since neither the Recourse Note nor the Nonrecourse Note represents genuine indebtedness, the Partnership's basis in its intangible contract right to *281 participate in the gross receipts of the film is limited to the cash portion of the purchase price paid for its contract right. The next issue for decision is the allowable method of depreciation. On its 1981 return, the Partnership claimed ACRS deductions for the film as five year recovery property. The Partnership acquired an intangible contract right which is not recovery property within the meaning of section 168(c); thus, the Partnership is not entitled to the claimed ACRS deductions. The Partnership is, however, entitled to depreciate its interest acquired from Orion utilizing the straight-line method of depreciation. Law v. Commissioner,86 T.C. at 1104; section 167(c). Doing the best we can with an unsatisfactory record, neither party having introduced satisfactory evidence as to the period of time all or most of the revenues from the film would be realized, our best judgment is that eight years is the useful life for the Partnership's intangible contract rights. See Cohan v. Commissioner,39 F.2d 540 (2d Cir. 1930). We next consider respondent's contention that the Partnership's motion picture activity was not an activity engaged *282 in for profit. The threshold test for determining whether an activity is engaged in for profit under section 183 is whether the activity in question was entered into with "the actual and honest objective of making a profit." Dreicer v. Commissioner,78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). Resolution of this issue must be determined at the partnership level, Taube v. Commissioner,88 T.C. 464, 478 (1987); Flowers v. Commissioner,80 T.C. 914, 932 (1983); Siegel v. Commissioner,78 T.C. 659, 698 (1982); Brannen v. Commissioner,78 T.C. 471, 505 (1982), affd. 722 F.2d 695 (11th Cir. 1984). While a reasonable expectation of profit is not required, a bona fide objective of making a profit must exist. Dreicer v. Commissioner, supra at 643-645; see also Estate of Baron v. Commissioner,83 T.C. 542, 553 (1984), affd. 798 F.2d 65 (2d Cir. 1986). In determining whether the Partnership engaged *283 in the activity for profit, "all of the facts and circumstances with respect to the activity are to be taken into account." Jasionowski v. Commisioner,66 T.C. 312 (1976); section 1.183- 2(b), Income Tax Regs. Based upon the record before us, we find that the Partnership's motion picture activity was an activity engaged in for profit. Glass was experienced in the negotiation of motion picture purchase and distribution agreements. He had organized other successful motion picture partnerships. Given the inherent risks in the motion picture industry, the facts surrounding the production and distribution of the film indicate a reasonable prospect of profit. After seeing a private screening of the film, Glass, on behalf of the Partnership, elected to invest in the film which starred experienced actors and involved an experienced and respected director and a well known screenwriter. The film was to be distributed by Orion through the distribution network of Warner Bros. Production costs were warranted to be not less than the purchase price paid by the Partnershsip. The film opened in wide release. As of December 31, 1985, the film had generated gross receipts *284 of $ 11,880,063. Consequently, we find that the Partnership's activity with respect to the film was one engaged in for profit under section 183. We next address whether advertising payments incurred by the Partnership were deductible in 1981. Respondent determined that advertising payments made by the Partnership in 1981 were not currently deductible because they were part of the purchase price and therefore should be capitalized. Respondent contends that the advertising expenses were actually part of the cash down payment for the film, although they were described as advertising payments in order to provide a current deduction. Petitioner argues that the advertising expenses were deductible by the Partnership as ordinary and necessary business expenses under section 162(a). Based on the record before us, it appears that the Partnership did not incur the advertising expenses. Invoices for advertising services were submitted to Orion and/or Warner Bros. and were paid from a special bank account at Chemical Bank created for this purpose. Warner Bros. employees had authority to sign checks paying for the advertising services. Amounts paid for advertising by Warner Bros. were *285 reimbursed to it by writing checks on this special bank account. With respect to the Marketing Loan, we conclude that such loan was not a bona fide debt of the Partnership. Orion and/or Warner Bros. effectively guaranteed the Partnership's purported debt obligation under the Marketing Loan Note to Chemical Bank. Further, it appears to us that the purpose of the Partnership's $ 4,000,000 advertising advance (such sum being comprised of proceeds from the Marketing Loan and $ 1,650,000 from cash capital contributions) under the Distribution Agreement was to transform a capital investment into a current deduction. Orion had complete control of the funds once they had been provided by the Partnership. Orion independently made the decisions regarding the use of the funds for advertising. Under the "advertising clause" in the Distribution Agreement, the Partnership was entitled to recoup sums from Orion as an Additional License Fee in the event Orion failed to meet its advertising expense commitment. Accordingly, as the Partnership was not itself incurring advertising expenses, petitioner is not entitled to deduct any portion of the amounts claimed by the Partnership as advertising *286 expenses. The $ 1,650,000 of the advertising advance is to be added to the Partnership's depreciable basis in its intangible contract right. Durkin v. Commissioner,87 T.C. at 1391, 1392. The next issue we must decide is the deductibility of the $ 20,000 legal fee paid to the law firm of Arnold & Porter for its tax opinion contained in the private offering memorandum. Petitioner asserts that the fee paid to Arnold & Porter is a deductible business expense under section 162 or alternatively, an organizational expense under section 709. Payments allocable to organization costs and syndication expenses must be capitalized. Organization costs, if elected, are amortizable over a 60-month period, but syndication costs are not amortizable. Sections 263, 709; Estate of Boyd v. Commissioner,76 T.C. 646, 658 (1981). Syndication expenses are those expenses connected with the issuing and marketing of partnership interests. Estate of Thomas v. Commissioner,84 T.C. 412 (1985); *287 section 1.709-2(b), Income Tax Regs.Legal fees paid to an attorney for the preparation of a tax opinion are syndication expenses which must be capitalized. Surloff v. Commissioner,81 T.C. 210 (1983). We find that the Partnership is not entitled to deduct any portion of the $ 20,000 legal fee paid to Arnold & Porter for its tax opinion as such payment must be capitalized as a syndication expense. The Partnership claimed $ 403,742 as organizational expenses and elected to amortize such expenses over 60 months, which resulted in a deduction of $ 35,119 for taxable year 1981. The $ 403,742 was comprised of management fees of $ 386,120 and other organizational costs of $ 17,622. Respondent contends that petitioner has neither substantiated $ 69,120 of the $ 403,742 claimed by the Partnership as organization expenses nor shown that the $ 403,742 amount was not in the nature of syndication expenses. As to the $ 69,120 substantiation issue, petitioner presented the testimony of Glass at trial. Petitioner claims that the $ 69,120 sum represents *288 management fees which were paid to Glass by crediting his capital account for such amount. There is no documentary evidence or testimony before us to indicate that Glass reported such sum as income. In this respect, the rule is well established that the failure of a party to introduce evidence within his possession and which, if true, would be favorable to him, gives rise to the presumption that if produced it would be unfavorable. Wichita Terminal Elevator Co. v. Commissioner,6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). Glass' uncorroborated testimony failed to persuade us that expenses in that amount were incurred for services rendered to the Partnership and is insufficient to overcome the presumption of correctness which attaches to respondent's determination. Welch v. Helvering,290 U.S. 111, 115 (1933); Rule 142(a). Thus, no deduction is permitted with respect to the $ 69,120 nor is such amount to be amortized or capitalized. As to the remaining amount claimed by the Partnership as amortizable organizational *289 expenses, petitioner must establish that portion of the expenses allocable to nondeductible capital expenditures and that portion allocable to deductible expenses. Estate of Boyd v. Commissioner,76 T.C. 646, 658 (1981). On brief, petitioner acknowledges that the Partnership did not maintain itemized records detailing its organizational expenses. While we presume that the Partnership must have incurred some organizational expenses, we have no basis for determining the reasonableness of the amount claimed. Accordingly, we must conclude that such amounts are in the nature of syndication expenses and must be capitalized. Because this opinion will determine the validity of the investment tax credit claimed by other partners of the Partnership, we deem it appropriate to address, and thus we shall decide, whether the Partnership is entitled to an investment tax credit with respect to its acquired interest in the film, notwithstanding the fact that in 1981 (the only year at issue) petitioner was unable to utilize his distributive share of the investment tax credit claimed *290 by the Partnership with respect to its purported investment in the film. Orion filed an election with the Internal Revenue Service to assign a portion of the investment tax credit with respect to the film to the Partnership. The Partnership then reported in its 1981 tax return a qualified investment in the film for investment tax purposes. Respondent asserts that no investment tax credit is available because the purported acquisition of the film by the Partnership had not been completed by the date the film was released. He alternatively asserts that the partners are not entitled to an investment tax credit because the Partnership did not have any "ownership interest" in the film within the meaning of section 48(k). Petitioner contends that he is entitled to his proportionate share of the Partnership's claimed credit base of $ 7,580,000. Respondent's argument that the release of the film preceded the Partnership's acquisition of its intangible contract right essentially challenges whether the acquired interest in the film was new section 38 property. A motion picture is "new" *291 section 38 property until such time it is placed in service in any medium of exhibition in any geographical area of the world; no investment tax credit is available to a taxpayer who acquires an ownership interest in the film after such time (except for certain costs subsequently incurred by the taxpayer). Section 1.48-8(a)(2), Income Tax Regs. A film is placed in service when it is first exhibited or otherwise utilized before the primary audience for which it was created. Section 1.48-8(a)(5), Income Tax Regs.
Respondent contends that if the Partnership acquired an ownership interest in the film, it did not do so until after the film was released on August 19, 1981. Glass testified at trial that the acquisition of the film was consummated on the morning of August 19, and the film was released later that night. Although the closing of the Partnership's transaction was delayed until August 19, we find that petitioner has met his burden of proof and that the contract right acquired by the Partnership is new section 38 property.
A *292 taxpayer is entitled to an investment tax credit under section 38 with respect to a motion picture film only if such film is "new section 38 property" (determined without regard to useful life) which is a "qualified film" and limited to the extent that the taxpayer has an "ownership interest" in such film. Section 48(k)(1)(A).
A taxpayer may have an "ownership interest" in a motion picture for purposes of the investment credit even if the taxpayer has neither legal title to nor a depreciable interest in the motion picture. Section 48(k)(1)(C) provides that a taxpayer's "ownership interest" in a qualified film "shall be determined on the basis of his proportionate share of any loss which may be incurred with respect to the production costs of such film." The existence and extent of an ownership interest is determined at the time the film is placed in service. Section 1.48-8(a)(4)(ii), Income Tax Regs.; S. Rept. 94-938 (1976), 1976-3 C.B. (Vol. 3) 49, 230. In enacting section 48(k), Congress recognized that more than one taxpayer may bear the risk *293 of loss with respect to the production costs of a film, and it authorized the Secretary of the Treasury to establish procedures for determining who is entitled to the credit or to a partial credit in such cases. S. Rept. 94-938, supra at 230.
Under section 1.48-8(a)(4)(iii), Income Tax Regs., a taxpayer who, "at the time a film is first placed in service, is a lender or guarantor of all or a portion of the funds used to produce or acquire the film or part thereof" is regarded as having a depreciable interest, for purposes of the investment tax credit, if such a taxpayer "can look for repayment or relief from liability solely to the proceeds generated from the exhibition or disposition of at least a part of the film." We have stated that the "thrust of section 1.48- 8(a)(4)(iii), Income Tax Regs., is to allow an investment tax credit to persons with an equity-like interest in the film, even if the interest does not amount to ownership or a depreciable interest, *294 but to disallow it to pure creditors, such as commercial lenders." Law v. Commissioner,86 T.C. at 1111. A "lender" under section 1.48-8(a)(4)(iii), Income Tax Regs., may be a person who has an open-ended financial interest in the exploitation of a film. Law v. Commissioner,86 T.C. at 1111- 1112; see also section 1.48-8(a)(4)(v)Example (1), Income Tax Regs.
Section 1.48-8(a)(4)(iii), Income Tax Regs., entitles a taxpayer who is a lender or guarantor to be regarded as having a depreciable interest for investment tax credit purposes if such taxpayer "can look for repayment or relief from liability solely to the proceeds generated from the exhibition or disposition of at least a part of the film." (Emphasis added.) In this case, the Partnership can look to the proceeds which the film generates to recoup its investment; however, the Partnership can also look to the Additional License Fee. We, therefore, *295 find that the "solely" requirement contained in section 1.48-8(a)(4)(iii), Income Tax Regs., has not been satisfied and conclude that the partners are not entitled to an investment tax credit with respect to the intangible contract right acquired by the Partnership. We do not read section 1.48-8(a)(4)(ii), Income Tax Regs., which provides that an ownership interest is determined at the time the film is placed in service, as requiring a different result. Although the film was placed in service in 1981 and any amount payable as an Additional License Fee could not be ascertained until after December 31, 1982, our reading of sections 1.48-8(a)(4)(ii) and (iii), Income Tax Regs., in pari materia requires us to conclude that the "solely" requirement cannot be avoided by the mere expedient of timing the event which gives rise to the repayment or relief of liability in a year subsequent to the year the film is placed in service. On the Partnership tax return for 1981, the Partnership claimed $ 16,092 as an interest expense. On brief, respondent *296 has conceded that the Partnership is entitled to deduct this amount under section 163. The Partnership also claimed $ 99 as a miscellaneous expense; we believe respondent has also conceded this amount. Section 6621(c)
The final issue for consideration is whether petitioner is liable for additional interest on substantial underpayments of tax attributable to tax motivated transactions. As respondent requested the addition to tax by motion filed subsequent to the issuance of the notice of deficiency, he has the burden of proof. Zirker v. Commssioner,87 T.C. 970 (1986); Parker v. Commissioner,86 T.C. 547 (1986); Rule 142(a).
Section 6621(c) of the Internal Revenue Code of 1986 provides for an increase in the rate of interest payable under section 6601 with respect to a "substantial underpayment" (defined as an underpayment in excess of $ 1,000) attributable to a tax-motivated transaction. Section 6621(c)(3)(A) enumerates *297 types of transactions which are to be considered "tax motivated transactions." These transactions include "(i) any valuation overstatement (within the meaning of section 6659(c)), (ii) any loss disallowed by reason of section 465(a) and any credit disallowed under section 46(c)(8), (iii) any straddle * * *, (iv) any use of an accounting method specified in regulations prescribed by the Secretary as a use which may result in a substantial distortion of income for any period, and (v) any sham or fraudulent transaction." Section 6621(c)(3)(A). The Treasury Department has promulgated temporary regulations which describe accounting methods which "may result in a substantial distortion of income." See section 301.6621-2T, Q&A-3, Temp. Proced. & Admin. Regs., T.D. 7998, 49 Fed. Reg. 50391 (Dec. 28, 1984); 1985-1 C.B. 368. These temporary regulations provide, in relevant part: Q-3. What accounting methods may result in a substantial distortion of income for any period under [section 6621(c)(3)(A)(iv)]? A-3. A deduction or credit disallowed, or income included, in any of the circumstances listed below shall be treated as attributable to the use of an accounting *298 method that may result in a substantial distortion of income and shall thus be a tax motivated transaction that results in a tax motivated underpayment: * * * (4) Any deduction disallowed for any period under section 709, relating to organization or syndication expenditures of a partnership; * * * (9) In the case of a taxpayer who computes taxable income using the cash receipts and disbursements method of accounting, any deduction disallowed for any period because (i) the expenditure resulting in the deduction was a deposit rather than a payment, (ii) the expenditure was prepaid for tax avoidance purposes and not for a business purpose, or (iii) the deduction resulted, in a material distortion of income * * *. Our first consideration in determining the applicability of the provisions of section 6621(c) is to determine which of the deductions and credits claimed by petitioner, if any, were the result of tax motivated transactions within the meaning of section 6621(c)(3)(A).
Under section 6621(c)(3)(A)(i), any valuation overstatement under section 6659(c) is treated as a tax motivated *299 transaction. Section 6659(c) provides that "there is a valuation overstatement if the value of any property, or the adjusted basis of any property, claimed on any return is 150 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis (as the case may be)." The Partnership claimed depreciation and an investment tax credit for its interest in the film. For purposes of depreciation the Partnership claimed a basis in the film of $ 11,930,000, whereas we have determined that the Partnership's basis in its interest with respect to its contract right was $ 3,150,000. Since the basis claimed ($ 11,930,000) is greater than 150 percent of the amount determined to be correct ($ 3,150,000), [6] the disallowance of the claimed depreciation of the film is attributable to a tax motivated transaction. *300 Although petitioner was unable to utilize his distributive share of the investment tax credit claimed by the Partnership for 1981, since this is a test case, we believe it appropriate to address whether the Partnership's claimed investment tax credit was the result of a tax motivated transaction. We have held that the Partnership is not entitled to an investment tax credit with respect to its interest in the film because it did not acquire an ownership interest within the meaning of section 1.48-8(a)(4)(iii), Income Tax Regs. Such is not a reason enumerated in either section 6621(c)(3)(A) or the Temporary Regulations. Consequently, the underpayment attributable to the disallowance of the investment tax credit is not an underpayment attributable to a tax motivated transaction within the meaning of section 6621(c). We have disallowed the Partnership's claimed deductions for the amortization of organizational expenses and deductions for tax advice because petitioner failed to prove that such amounts were not syndication expenses within the meaning of section 709. The Temporary Regulations provide that a transaction resulting in any deduction disallowed *301 pursuant to section 709 is to be considered the use of an accounting method which may result in a substantial distortion of income within the meaning of section 6621(c)(3)(A)(iv), and therefore a tax motivated transaction. Accordingly, the underpayment attributable to the disallowance of these deductions is an underpayment attributable to a tax motivated transaction. The last item disallowed was the claimed deduction for advertising expenses made pursuant to the Distribution Agreement. In substance, the characterization of a payment by the Partnership to Orion as advertising expenses was merely an attempt to convert a capital investment into a current deduction. We view this subterfuge as using the cash receipts and disbursements method of accounting to create a material distortion of income. While we recognize that our actual basis for disallowing the Partnership's claimed advertising expense deduction was that the Partnership did not incur advertising expenses, we believe that the facts leading to this conclusion are so integrally related to the Partnership's attempt to create a distortion of income that the two holdings are inseparably related. See McCrary v. Commissioner, *302 92 T.C.     (filed April 17, 1989) (slip. opinion at pp. 46-48). Accordingly, we find that the disallowance of this deduction resulted from the use of "an accounting method * * * that may result in a substantial distortion of income" under section 6621(c)(3)(iv), as further specified in section 301.6621-2T, Q&A-3(9)(iii), Temp. Proced. and Admin. Regs. The underpayment resulting from such disallowed deduction is therefore attributable to a tax motivated transaction. In order to impose additional interest under section 6621(c), the underpayments resulting from the disallowance of deductions which we have found to be the result of tax motivated transactions must be in excess of $ 1,000 with respect to petitioner in order to be substantial within the meaning of section 6621(c)(2). To reflect the foregoing and concessions of the parties, Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all subsequent section references are to the Internal Revenue Code of 1954, as amended and in effect during the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. See Brown v. Commissioner,T.C. Memo. 1988-527; Evans v. Commissioner,T.C. Memo. 1988-468; Vandenhoff v. Commisioner,T.C. Memo. 1987-116; and Schwartz v. Commissioner,T.C. Memo. 1987-381↩, for a more detailed summary of Glass' industry experience.
3. Glass testified that the $ 1,400,000 was in fact paid in September, 1981.↩
4. This holding is in accord with our holdings in other cases involving motion picture transactions in which Mr. Glass was involved. See Brown v. Commissioner,T.C. Memo. 1988-527; Schwartz v. Commissioner,T.C. Memo. 1987-381 n. 25; Isenberg v. Commissioner,T.C. Memo. 1987-269; and Vandenhoff v. Commissioner,T.C. Memo. 1987-116. But see Evans v. Commissioner,T.C. Memo. 1988-468, and Jacobson v. Commissioner, T.C. Memo. 1988-341↩, cases with different facts, but involving film partnerships in which Mr. Glass was a general partner.
5. On direct examination, Glass testified as follows with respect to the multiplier clause: Q In the distribution agreement, there is a formula set forth for payments on the recourse note, and it has various multipliers. Kindly explain the rationale of that section of the agreement. A Well, that was the result of long, drawn-out negotiations with Orion and Warner Brothers. I had, not many months before, had a deal with Orion on a picture * * * and we had to terminate that transaction shortly before its scheduled closing, because Orion wouldn't assure me that they would file their tax returns in conformity with the understanding that they were selling me the picture; in other words, that they would give up any right to claim depreciation. And so they were confronted with the fact that they were going to lose the investment tax credit. They were going to lose the right to depreciate, and they wanted to find a formula that would give them some -- way of taking write-offs which would at least correspond to what they would have had, had they retained ownership of the film. And this formula, since they were on the accrual method of accounting, the formula was designed, as I understood it -- and one would have to ask them, because I can't crawl into their minds, but this is what was explained to me, because their tax people were involved -- that this gave them the opportunity to have fixed and determinable amounts in the years in which they would otherwise be depreciating the film, which they could take as deductions because they were amounts that would be -- * * * -- to Prince Associates until 1990, they could nevertheless accrue them for tax purposes in the year in which they were -- in which the amount was fixed and determinable, from their point of view. And that's -- so we had this complicated formula.↩
6. We recognize that the Partnership claimed a basis in the film and that we determined that the Partnership had basis in only an intangible contract right. However, analyzing the valuation overstatement from the perspective of the two property rights being identical would require comparing the Partnership's claimed basis in the film to the Partnership's actual zero basis in the film and we would therefore reach the same result. See Zirker v. Commissioner,87 T.C. 970↩ (1986).